UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X

PETER FERDINANDI,

                Plaintiff,

    -against-

SITUSAMC HOLDINGS CORPORATION,
D/B/A HANOVER STREET CAPITAL
LLC,

                Defendant.

------------------------------------------------------ X

Case No. 1:24-CV-07805-JGK

**DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to FED. R. CIV. P. 56 and Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, Defendant Situs AMC Holdings Corporation (incorrectly pled as "SitusAMC Holdings Corporation d/b/a Hanover Street Capital LLC") ("Defendant") submits this Statement of Undisputed Material Facts as to which Defendant contends there is no genuine issue to be tried in support of its Motion for Summary Judgment.[1]

## I.    About SitusAMC and Hanover

1.    SitusAMC is a leading independent solutions provider to the commercial and residential real estate finance industry. The Company helps clients identify and capture opportunities in their real estate businesses through industry-leading services and innovative technologies that drive operational efficiency, increase business effectiveness, and improve market

---

[1]    For the purposes of summary judgment only, Defendant presents these facts as "undisputed" and in the light most favorable to Plaintiff.  Defendant expressly reserves the right to challenge the veracity and relevance of each and every fact herein at trial or in any other proceeding. Copies of all pleadings, deposition testimony, and exhibits cited herein are annexed to the accompanying Declaration of Courtney S. Stieber Esq. ("Stieber Decl."). All depositions will be referred to herein as "[last name] Dep." Excerpts of the following deposition transcripts are annexed to the Stieber Decl.: Plaintiff Peter Ferdinandi ("Pl. Dep."), Exhibit ("Ex.") A; Michael Franco ("Franco Dep."), Ex. B; Anne Jablonski ("Jablonski Dep."), Ex. C;  Tanya Sacco ("Sacco Dep."), Ex. D; and Holly Mickens ("Mickens Dep."), Ex. E.

agility across the entire lifecycle of their global real estate activity. (Declaration of Seema Nathani ("Nathani Decl."), at ¶ 3).

2.      Hanover Street Capital ("Hanover") is a dedicated platform of SitusAMC that operates as a separate entity under SitusAMC. (Pl. Dep. 43:11-44:12).

3.      The purpose of Hanover is to provide staff to Deutsche Bank that perform services. (Franco Dep. 27:2-21).

4.      Hanover is an extension of Deutsche Bank and exists solely to service Deutsche Bank. (Pl. Dep. 44:13-45:7).

5.      Deutsche Bank is the only client and customer of Hanover. (Pl. Dep. 45:4-13; Franco Dep. 86:2-4).

**II.      Overview of Plaintiff's Employment With Hanover**

6.      On June 4, 2012, Plaintiff accepted an offer to serve as the Chief Operating Officer ("COO") of Hanover, reporting to John Weaver. (Pl. Dep. 50:9-17, 51:10-16; Stieber Decl., Ex. F).

7.      At the time Plaintiff was hired as the COO, his base salary was $225,000 per year. (Pl. Dep. 51:3-6, 143:4-8; Stieber Decl., Ex. F).

8.      Plaintiff was eligible to participate in Defendant's annual discretionary bonus program. The bonus was awarded at Defendant's sole discretion. (Pl. Dep. 51:7-9; Stieber Decl., Ex. F).

9.      Plaintiff's base salary in 2021 was $400,000. (Pl. Dep. 143:9-11).

10.     Plaintiff's base salary remained $400,000 through the remainder of his employment. (Pl. Dep. 143:4-16, 190:17-22).

11.     Plaintiff was the highest paid employee on the Hanover platform. (Pl. Dep. 371:6-9).

### III.    Defendant's Policies And Procedures

12.    Defendant maintains a policy against discrimination, harassment and retaliation and did so during the entirety of Plaintiff's employment with Defendant. (Pl. Dep. 85:24-86:3; Stieber Decl., Ex. G at SITUSAMC_000008-11, Ex. H at SITUSAMC_000276-279, Ex. I at SITUSAMC_000442 - 446).

13.    Plaintiff received Defendant's 2021 Employee Handbook, Defendant's Discrimination Policy, Defendant's Harassment Retaliation Complaint Form, Defendant's Formal Complaint Form Template, and Defendant's Receipt of Complaint Process. (Pl. Dep. 85:13-19; Stieber Decl., Ex. G at SITUSAMC_000001).

14.    Defendant's 2021 Employee Handbook sets forth Investigation Procedures for how Defendant processes employee complaints of discrimination, harassment, or retaliation. (Stieber Decl., Ex. G at SITUSAMC_000011).

15.    Defendant does not maintain a formal investigation policy for a situation in which a client makes an allegation against an employee. (Franco Dep. 126:25-127:19).

16.    Defendant's Investigation Procedures state that "[t]o the extent possible, the Company will endeavor to keep the reporting employee's concerns confidential." (Stieber Decl., Ex. G at SITUSAMC_000011; Pl. Dep. 267:24 – 268:10).

17.     Defendant's Investigation Procedures in its 2021 Employee Handbook states that "[t]he Company will take corrective measures against any person who it finds to have engaged in conduct in violation of this policy, if the Company determines such measures are necessary." (Stieber Decl., Ex. G at SITUSAMC_000011).

18.    Defendant's 2022 Employee Handbook contains similar policies. (Stieber Decl., Ex. H at SITUSAMC_000278-279).

19.     Plaintiff acknowledged that he read Defendant's 2021, 2022, and 2023 Employee Handbooks. (Pl. Dep. 85:13-23, 141:25-142:12, 142:13-25; Stieber Decl., Ex. G at SITUSAMC_000001, Ex. H at SITUSAMC_000266, Ex. I at SITUSAMC_432).

**IV.     Background On Key Individuals**

20.     Since 2019 through the present, Michael Franco ("Franco") (Caucasian) has served as the Chief Executive Offer of SitusAMC. (Franco Dep. 8:20-9:8; Pl. Dep. 391:17-19). Plaintiff does not know how old Michael Franco is, but guesses that he is younger than him. (Pl. Dep. 391:11-12). As of November 6, 2023, Franco was approximately 42 years old. (Nathani Decl., ¶ 10).

21.     Anne Jablonski ("Jablonski"), Head of Commercial Real Estate and Executive Managing Director, SitusAMC since approximately February of 2020, is believed to be Caucasian. (Pl. Dep. 391:13-16; Jablonski Dep. 8:21-9:12).

22.     Plaintiff believes that Jablonski is around his age, which, at the time of his deposition in October 2025, was 53 years old. (Pl. Dep. 391:9-10).

23.     Dino Paparelli ("Paparelli"), Head of Commercial Real Estate, Deutsche Bank, is believed to be Caucasian. (Pl. Dep. 34:2-6, 390:22-25).

24.     Plaintiff does not know how old Paparelli is. (Pl. Dep. 42:8-13).

25.     Andrew Mullin ("Mullin"), Deutsche Bank, is believed to be Caucasian. (Pl. Dep. 391:2-4).

26.     Plaintiff believes that Mullin is over 50 years old. (Pl. Dep. 42:3-7).

27.     Mullin was Plaintiff's primary contact at Deutsche Bank. (Pl. Dep. 147:18-22).

28.     Holly Mickens ("Mickens"), Managing Director, Head of Talent Solutions, SitusAMC, is Caucasian. (Pl. Dep. 392:8-9; Mickens Dep. 16:8-17).

29.    During Plaintiff's employment with Hanover, June Campbell was hired as the Chief Financial Officer (CFO) of SitusAMC—not Hanover. (Pl. Dep. 325:17-326:11). Plaintiff remained CFO of Hanover after June Campbell's appointment. (Pl. Dep. 326:9-17). Campbell's responsibilities were broader than Plaintiff's, as she was the CFO for the entire organization (i.e., SitusAMC). (Pl. Dep. 325:17-326:17.)

**V.    COVID-19 Return To Work Policies; Plaintiff's Accommodation**

30.    On September 10, 2021, a Director at Deutsche Bank, emailed Plaintiff to provide him with an update on the then-current state of Deutsche Bank "Future of Work" and return to office plan, which related to Plaintiff's ongoing work in preparing the return to office and EAP plans. (Stieber Decl., Ex. J at SITUSAMC_000833-834; Pl. Dep. 196:10-197:8).

31.    That email informed Plaintiff that Deutsche Bank's office located at West 60th Street in New York City "is a vaccination only office." (Stieber Decl., Ex. J at SITUSAMC_000833-834). Further, "DB does not have a vaccine mandate, however, in order to operate from within a DB office, vaccination is a requirement." (*Id.*).

32.    Plaintiff is not vaccinated for COVID-19. (Pl. Dep. 119:3-5.)

33.    Plaintiff's wife and children are not vaccinated for COVID-19 because of a "personal decision." (Pl. Dep. 170:23-171:6).

**VI.    Plaintiff's Attendance At The New York Football Giant's Game.**

34.    On September 12, 2021, Plaintiff attended a New York Giants Football game, organized as a client-facing opportunity to bring together the Deutsche Bank leadership team in advance of implementing a return to work following COVID-19. (Pl. Dep. 145:6-13, 205:5-7).

35.    In attendance at the Giants game were employees of Hanover including, but not limited to, Clint Graham, Tom Deja, Josh Phillips, Ed Mikus, and Wilson Au. (Pl. Dep. 145:14-

146:4). Raj Mehta ("Mehta"), who is employed by an affiliate of SitusAMC, also attended. (Pl. Dep. 137:17-20, 145:6-13).

36.   From Deutsche Bank, Mullin attended the Giants game. (Pl. Dep. 146:5-13).

37.   Anne Jablonski was not present at the Giants game. (Pl. Dep. 145:16-24; Jablonski Dep. 52:19-21).

38.   Plaintiff consumed alcohol at the Giants game. (Pl. Dep. 148:20-149:15).

39.   At the Giants game, Plaintiff made a joke about COVID-19 vaccine cards. (Pl. Dep. 155:13-16).

40.   Plaintiff recalls making a joke about COVID-19 vaccine cards; specifically stating, "I got a guy." (Pl. Dep. 155:15-157:21).

41.   Mullin overheard Plaintiff make a remark about COVID-19 vaccine cards. (Pl. Dep. 157:22-24; Stieber Decl., Ex. K at SITUSAMC_001100).

42.   Plaintiff also made comments about another Deutsche Bank employee not being present at the Giants game. (Pl. Dep. 77:21-78:5, 172:22-173:2).

43.   The other Deutsche Bank employee, who identifies as homosexual, did not attend the game. (Pl. Dep. 77:21-78:5, 79:2-6, 172:22-173:2).

**VII.   Deutsche Bank Complains Of Plaintiff's Behavior, Requests His Removal As COO; Defendant Removes Plaintiff As COO Of Hanover; Defendant Investigates Plaintiff's Behavior Arising Out Of The Giants Game**

44.   On September 12, 2021, at 9:44 p.m., Mullin emailed Jablonski raising concerns about what occurred at the Giants game. (Stieber Decl., Ex. J at SITUSAMC_000832, Ex. K at SITUSAMC_001100-1101; Jablonski Dep. 53:21-54:3, 54:16-23).

45.   On September 13, 2021, Mullin and Jablonski spoke via telephone. (Jablonski Dep. 59:14-20).

46.    Mullin complained to Jablonski that Plaintiff made a homophobic comment at the Giants game. (Jablonski Dep. 57:9-21, 107:23-108:21; Stieber Decl., Ex. K at SITUSAMC_001100).

47.    Mullin was also concerned about an off-colored joke Plaintiff made in relation to COVID vaccination cards. (Jablonski Dep. 57:9-21).

48.    Mullin believed Plaintiff's behavior was "completely unacceptable." (Stieber Decl., Ex. K at SITUSAMC_001100-1101).

49.    Mullin expressed concerns with Plaintiff's work performance. (*Id.*).

50.    Mullin stated that he has "noticed[, from Plaintiff,] an increasing political and inappropriate/non professional response to many of DB's concerns that are not in line with DB's corporate policy/values/beliefs." (Stieber Decl., Ex. K at SITUSAMC_001101).

51.    Following the Giants game, Mullin began to question the Deutsche Bank – Hanover relationship for the first time in 10 years. (*Id.*).

52.    Mullin expressed to Jablonski, and also to Plaintiff, that Deutsche Bank had an increasing feeling of a lack of engagement from Hanover. (*Id.*; Pl. Dep. 207:12-208:12).

53.    Mullin complained to Jablonski that when he raised his concerns with directly with Plaintiff, Plaintiff makes it political, brings up how the defunding the police has affected the city and the safety of those commuting by mass transit. (Stieber Decl., Ex. K at SITUSAMC_001100).

54.    Mullin complained that Plaintiff crossed many lines at the Giants game and did not exercise good judgment. (*Id.*).

55.    Mullin raised issues about technology. (Jablonski Dep. 78:17-19).

56.     Mullin raised concerns that there was a disconnect with younger professionals, specifically, that they felt like they were not being mentored appropriately under Plaintiff's leadership. (Jablonski Dep. 78:7-79:3).

57.     Mullin believed that Plaintiff had not formulated any relationship beyond him and that in his role as COO, he should have been having conversations with other leaders at Deutsche Bank. (Jablonski Dep. 81:17-24).

58.     Separately, Mehta, the COO of CLOSER, a separate business that is not part of Hanover, contacted Jablonski on or about September 13, 2021, to express concerns about what happened at the Giants game. (Jablonski Dep. 49:5-11, 54:4-15). Jablonski recalls Mehta expressing concerns about off-colored jokes, comments that were made in relation to COVID cards. (Jablonski Dep. 57:9-21).

59.     Mullin informed Jablonski that he and Paparelli decided that it would be best to have Plaintiff removed as the head of the Hanover platform and have a new leader inserted. (Stieber Decl., Ex. K at SITUSAMC_001101; Franco Dep. 99:15-23; Pl. Dep. 269:24-270:9).

60.     Plaintiff has no reason to dispute the issues Mullin raised to Jablonski. (Pl. Dep. 216:16-19).

61.     None of Defendant's employees complained that Plaintiff used a homophobic slur. (Pl. Dep. 269:10-12).

62.     The only person that accused Plaintiff of making a homophobic statement was Mullin, who was a Deutsche Bank employee, and the client contact for the relationship. (Pl. Dep. 33:22-25, 269:6-9).

63.     In late-September / early October 2021, Defendant removed Plaintiff as the COO of Hanover. (Franco Dep. 140:6-14; Jablonski Dep. 156:13-16).

64.    Despite being removed as COO of Hanover, Plaintiff's base salary remained the same. (Jablonski Dep. 134:14-24; Pl. Dep. 277:6-17, 375:12-17; Stieber Decl., Ex. L at SITUSAMC_000687-689).

65.    Plaintiff was told that he was being removed as COO and Head of Hanover because of the complaints raised by Mullin stemming from the Giants game. (Pl. Dep. 179:3-5, 269:24-270:9; Jablonski Dep. 118:8-15; Franco Dep. 84:24-85:11).

66.    Deutsche Bank informed Defendant that it did not want Plaintiff in the position of COO and Head of Hanover, which Franco conveyed to Plaintiff. (Pl. Dep. 269:24-270:5; Jablonski Dep. 117:10-118:15, 136:12-20; Franco Dep. 84:24-85:11, 203:5-12).

67.    Defendant directed Plaintiff to attend sensitivity training and coaching because Deutsche Bank had made an accusation of inappropriate behavior. (Pl. Dep. 265:2-10, 270:10-12; Franco Dep. 166:7-18). Plaintiff successfully completed sensitivity and training. (Pl. Dep. 265:2-10, 270:10-12; Stieber Decl., Ex. M).

68.    On or about October 29, 2021, Defendant initiated an investigation into whether Plaintiff made the alleged inappropriate comments, which was led by Linda Ryley ("Ryley") in Human Resources. (Franco Dep. 95:24-96:11, 98:9-15).

69.    Ryley interviewed the following individuals as part of her investigation: Plaintiff, Mullin, Ed Mikus, Wilson Au, Raj Mehta, Joshua Phillips, Tom Deja, and Clint Graham. (Pl. Dep. 178:5-14; Franco Dep. 133:15-19, 149:20-150:10; Stieber Decl., Ex. N).

70.    The investigation did not corroborate the alleged homophobic slur as it was an inconclusive "he said/he said." (Franco Dep. 105:24-106:7).  Had the investigation corroborated a homophobic statement, Plaintiff's employment would have been terminated. (Franco Dep. 148:6-14).

9

**VIII.   Defendant Hires Sunil Madan As Its New COO; Plaintiff Transitions To CFO**

71.     In December 2021, Defendant hired Sunil Madan ("Madan") as Managing Director, COO, of Hanover. (Pl. Dep. 273:7-19).

72.     Madan was directly recommended to serve as COO of Hanover by Deutsche Bank. (Pl. Dep. 274:20-25; Franco Dep. 115:14-18).

73.     Madan was hired because he had an understanding of the inner working of Deutsche Bank, had the trust of the key stakeholders at Hanover, and leadership believed he would be successful as the COO. (Franco Dep. 110:17-111:8).

74.     Madan's employment was paid for by Deutsche Bank (i.e., he was a cost-plus employee), which meant that Hanover could not hire a candidate and force Deutsche Bank to accept that candidate unless the bank was willing to pay for him. (Franco Dep. 113:11-20). Deutsche Bank had the final say in deciding to hire Madan. (Franco Dep. 113:11-20).

75.     Deutsche Bank did not communicate to Defendant that it wanted somebody hired for the COO role that would assist them in meeting a DEI-type goal. (Franco Dep. 113:21-114:10).

76.     Madan's ethnicity or age were not factors that were considered in hiring him as the COO of Hanover. (Franco Dep. 115:6-13).

77.     Madan's base salary as COO of Hanover was less than Plaintiff's base salary at the time in which Madan started working for Hanover. (Nathani Decl., Ex. B).

78.     Madan's offer letter sets forth his compensation package. (Nathani Decl., Ex. B)

79.     According to Plaintiff, Madan is a non-white, Indian American male. (Pl. Dep. 390:16-21).

80.     Plaintiff also believes that Madan is around his age, which, as of the time of his deposition, was 53 years old. (Pl. Dep. 391:5-8).

81.    Madan was 54 years old when he assumed the role of COO and Head of Hanover. (Nathani Decl., at ¶ 9).

82.    Effective April 20, 2022, Defendant transitioned Plaintiff to CFO of Hanover. (Pl. Dep. 276:11-277:17; Stieber Decl., Ex. L).

83.    With this transition, Plaintiff remained a Managing Director. (Pl. Dep. 277:6-17; Stieber Decl., Ex. L).

84.    When Plaintiff was removed as COO and moved into the CFO role, he was no longer in a client-facing role because the client, Deutsche Bank, did not want to work directly with him. (Pl. Dep. 376:17-377:7).

85.    Plaintiff reported to Madan when he was serving as the CFO of Hanover. (Pl. Dep. 277:6-9).

86.    Plaintiff's annual salary remained the same in his role as CFO of Hanover. (Pl. Dep. 277:10-17).

87.    Plaintiff was eligible to receive a discretionary annual bonus with a target amount of 40% in his role as CFO. (Pl. Dep. 277:18-278:3).

88.    During the time period in which Plaintiff was performing in his new role as CFO, Deutsche Bank expressed that they were no longer willing to pay at all for Plaintiff's services. (Franco Dep. 182:7-183:7). Deutsche Bank also stated that anybody they were paying for that was associated with certain administrative related activities, they would no longer pay for. (Franco Dep. 183:8-16).

89.    Plaintiff was also eligible to receive a bonus of either $100,000 or $200,000 if Deutsche Bank were to execute the omnibus renewal agreement no later than December 31, 2023. (Pl. Dep. 278:4-13).

90. The agreement was executed and Plaintiff received a $200,000 bonus. (Pl. Dep. 328:8-19).

91. Before Plaintiff was removed as COO of Hanover, Plaintiff told Mickens, "Situs owes me. Situs is going to pay. I'm not leaving." (Mickens Dep. 41:19-43:7).

IX. **Plaintiff Alleges He Complained Of A Single Comment Made By Madan Towards Mickens**

92. On January 13, 2022, Plaintiff, Mickens, Madan, and other individuals across SitusAMC and Hanover participated in a Commercial Real Estate Leadership Team (CRELT) call during which every business leader gives a business update. (Mickens Dep. 61:6-22).

93. According to Plaintiff, Madan used words towards Mickens that were "insulting, unprofessional, and misogynistic." (Pl. Dep. 92:11-15).

94. Plaintiff could not identify the words used by Madan. (Pl. Dep. 92:11-93:3).

95. Mickens testified that during the call, Madan, being new to the Company and not understanding the business, was concerned that an analyst seconded to Deutsche Bank was moving to join another SitusAMC platform that Mickens managed and was concerned that Mickens may have been involved in recruiting him. (Mickens Dep. 67:10-68:10).

96. After the meeting, Plaintiff texted Mickens to let her know that he appreciates her and enjoys working with her. (Stieber Decl., Ex. O).

97. In Plaintiff's text message to Mickens, neither him nor Mickens mentioned Madan's words that Plaintiff alleged were purportedly "insulting, unprofessional, and misogynistic." (Stieber Decl., Ex. O).

98. Mickens believed it was a "non-event." (Mickens Dep. 62:13-16).

99. Mickens believed that Plaintiff was more disturbed than her at the comment made by Madan, and she took it as Madan being new in the business. (Mickens Dep. 62:13-25).

100.    Madan had his style of working and was doing so at the direction of the client. (Mickens Dep. 74:13-24).

101.    Madan was a tough business leader. (Mickens Dep. 85:4-10).

102.    Madan was challenging to work with. (Jablonski Dep. 149:18-25).

103.    Mickens believed that Plaintiff would sometimes get in his own way because of his dislike for Madan. (Mickens Dep. 84:6-20).

104.    After the CRELT call, Mickens and Madan spoke and resolved their issues directly. (Mickens Dep. 62:13-63:25, 67:10-68:18). During that call, Mickens never told Madan that Plaintiff had expressed any concerns and Madan never mentioned Plaintiff. (95:23-96:10).

## X.    **Plaintiff Registers A Complaint With Jablonski And Steve Powel Regarding Madan**

105.    On July 24 and 25, 2022, Plaintiff was on an email chain with Madan, Jablonski, and Steve Powel ("Powel"), a former CEO of Defendant. (Pl. Dep. 295:16-18; Franco Dep. 190:8-24; Stieber Decl., Ex. P).

106.    In one email, Plaintiff was moved to BCC. (Pl. Dep. 301:14-17). Plaintiff cites this as an instance in which he was excluded from ongoing conversations. (*Id.*).

107.    On July 25, 2022, Plaintiff sent a text message to Powel, subsequent to this email, in which he complained that he is "kept in the dark." (Stieber Decl., Ex. Q).

108.    On July 25, 2022, Plaintiff sent a text message to Jablonski, subsequent to this email, in which he complained that he finds it "interesting that S[unil] [ ] M[adan] elegantly cuts me out because He says I am swamped . . . ." (Stieber Decl., Ex. R). Plaintiff testified that at a later point in his tenure, Madan excluded him from meetings, but when asked why Madan did not want him in those meetings, he testified, "I have no idea why he didn't want me in those meetings." (Pl. Dep. 103:14-104:17).

13

109.    Plaintiff also complained to Jablonski that "[i]nfo is so closely controlled and shared on a need to know basis." (*Id.*).

110.    Plaintiff told Jablonski "He really pissed me off today" and Jablonski responded, "He seems to be doing that everyone he works with." (*Id.*; Pl. Dep. 320:14-25.)

111.    Plaintiff acknowledges that other people also had issues with Madan. (Pl. Dep. 320:14-321:22.)

## XI.    Complaints Regarding Madan (Generally)

112.    Tanya Sacco ("Sacco"), former Director of Global HRBP, SitusAMC, was not asked during her employment with Defendant to investigate Madan's workplace conduct. (Sacco Dep. 18:12-17, 61:22-62:2).

113.    During Sacco's employment with Defendant, there were no instances in which she was asked to, on an informal basis, look at Madan's conduct towards employees working for Hanover. (Sacco Dep. 62:3-9).

114.    Sacco was never asked to look into a complaint about Madan's treatment of Mickens. (Sacco Dep. 62:10-13).

115.    Plaintiff never expressed to Sacco concerns that Madan was violating Defendant's discrimination, harassment, or retaliation policies. (Sacco Dep. 126:14-19).

116.    Plaintiff never expressed to Sacco concerns that Madan was engaging in conduct that would constitute discrimination, harassment, or retaliation. (Sacco Dep. 126:20-127:1).

117.    Plaintiff complained to Jablonski that Madan was "challenging" to work with. (Jablonski Dep. 143:17-144:3).

118.    Plaintiff never raised complaints to Jablonski that concerned allegations of discrimination, harassment, or retaliation. (Jablonski Dep. 186:13-23).

14

119.    Jablonski never received complaints about Madan during his employment with Defendant that involved concerns of discrimination, harassment, or retaliation. (Jablonski Dep. 186:13-20).

120.    Defendant has not received any formal complaints of unlawful harassment, discrimination, or retaliation against Madan. (Franco Dep. 68:5-70:12).

## XII.    Plaintiff's Transition To The Agile Transformation Team

121.    In approximately April 2023, Plaintiff was assigned to Project Altitude. (Pl. Dep. 339:22-25, 344:4-11).

122.    Project Altitude was an agile transformation process across both technology and operations teams. (Franco Dep. 186:16-187:4).

123.    Jablonski assigned Plaintiff to Project Altitude. (Pl. Dep. 342:3-7).

124.    During the time in which Plaintiff was assigned to Project Altitude, he reported to Mickens. (*Id.* at 340:4-12).

125.    Plaintiff's title on Project Altitude was Orchestrator. (*Id.* at 339:7-16).

126.    Plaintiff worked on Project Altitude with Martin Spiegelman ("Spiegelman"), Bruce Davidson ("Davidson"), and Norma Pinkhas ("Pinkhas"). (*Id.* at 339:7-21).

127.    Davidson was employed by SitusAMC, not Hanover. (Jablonski Dep. 164:25-165:7).

128.    Davidson is Caucasian. (Pl. Dep. 347:16-19).

129.    Davidson, unlike Plaintiff, had an asset management background. (*Id.* at 353:20-354:3).

130.    Plaintiff believes that Davidson is around his age. (*Id.* at 347:20-21).

131.    Spiegelman is Caucasian. (*Id*. at 347:22-25).

132.    Plaintiff believes that Spiegelman was possibly older than him. (*Id.*).

15

133.    Spiegelman is no longer employed by Defendant. (Franco Dep. 189:7-9).

134.    Pinkhas is a female and Plaintiff does not know her race or ethnicity. (Pl. Dep. 348:2-4).

135.    Plaintiff believes Pinkhas is younger than him. (Pl. Dep. 348:7-8).

136.    Pinkhas is no longer employed by Defendant. (Franco Dep. 189:10-16).

137.    Project Altitude was operationally unsuccessful. (Franco Dep. 186:16-187:11).

### XIII.  SitusAMC Terminates Plaintiff's Employment

138.    Franco, Jablonski, Sacco, and Human Resources were involved in the decision to terminate Plaintiff's employment. (Franco Dep. 77:22-79:5; Jablonski Dep. 169:6-171:9).

139.    Madan was not involved in the decision to terminate Plaintiff's employment. (Franco Dep. 78:5-7).

140.    The decision to terminate Plaintiff's employment was made by Franco. (Jablonski Dep. 171:3-9; Franco Dep. 77:22-24).

141.    At the time in which Plaintiff's employment was terminated, Plaintiff was the only Hanover employee on Project Altitude whose role was not being paid for by Deutsche Bank. (Franco Dep. 187:12-188:12).

142.    At the time in which Plaintiff's employment was terminated, Spiegelman continued to be paid for by Deutsche Bank on a cost-plus basis. (Franco Dep. 188:5-12).

143.    Davidson operated outside of Hanover. (Franco Dep. 187:25-188:4).

144.    Plaintiff's role was eliminated because Deutsche Bank was no longer paying for his role and because Project Altitude was terminated from an operational perspective, Plaintiff's position was redundant. (Franco Dep. 187:12-188:12).

145.    On at least one occasion prior to the termination of his employment, Deutsche Bank had complained of how high Plaintiff's salary was. (Jablonski Dep. 40:16-23).

16

146. Plaintiff was aware that Deutsche Bank believed he was overcompensated. (Jablonski Dep. 41:15-24).

147. On November 6, 2023, Plaintiff was informed that his employment would be terminated. (Pl. Dep. 355:14-20; Nathani Decl., Ex. A, at p. 1).

148. Plaintiff's employment was terminated as part of a broader reduction-in-force ("RIF") that impacted over thirty employees. (Franco Dep. 78:8-13; Nathani Decl., Ex. A, at p. 13).

## XIV.   **Plaintiff's Severance Package**

149. At the time in which Plaintiff was informed his employment would be terminated, he was offered a separation package that included a lump sum payment comprising 83% of the annual bonus he received in 2022. (Pl. Dep. 357:23-358:2; Nathani Decl., Ex. A, Ex. C). Plaintiff was also offered a lump sum payment for one month of COBRA. (Pl. Dep. 358:3-5; Nathani Decl., Ex. A, Ex. C).

150. Plaintiff alleges that another former female managing director had received a more favorable separation package than he did. (Pl. Dep. 358:6-21).

151. The former female managing director Plaintiff points to had their employment terminated several years before Plaintiff's employment was terminated. (*Id.* at 368:22-369:3).

152. Plaintiff also alleges that two women whose employments were terminated in 2019 and who had different positions received more favorable separation packages than he did. (*Id.* at 358:6-16, 361:23-362:8, 364:13-365:4).

153. SitusAMC has a standard severance policy that it follows that is different than what existed in historical periods. (Franco Dep. 213:8-13). The policies of SitusAMC are different than what they were in 2019 and prior. (Franco Dep. 212:21-213:7).

154.    Plaintiff's severance package exceeded the Company's existing severance policy, but the package was consistent for anyone with the Managing Director (MD) title included in the RIF. (Franco Dep. 217:22-219:3).

155.    Plaintiff explains that the basis for his belief that his severance package was pretextual was "[t]he ongoing course of conduct, the retaliatory aspects of [Madan], unfair treatment, they did nothing to address any of my concerns and then as I explained, the systems got worse and worse and then ultimately you fired me and you left him in place." (Pl. Dep. 369:13-22).

156.    Plaintiff has no knowledge as to whether he was treated the same as another managing director at the time of his separation. (Pl. Dep. 369:4-12).

157.    Aside from Plaintiff, only one other individual with the title, Managing Director, was included in the same RIF. (Franco Dep. 218:12-219:3; Nathani Decl., Ex. C).

158.    The other Managing Director included in the same RIF as Plaintiff received a lower severance amount than Plaintiff, but her severance was calculated in the same manner as his package. (Nathani Decl., Ex. C).

159.    Plaintiff did not identify any female co-worker that was treated better than him. (Pl. Dep. 401:15-22).

Dated: June 16, 2026
        New York, New York

Respectfully submitted,

**SEYFARTH SHAW LLP**

*/s/ Courtney S. Stieber*

Courtney S. Stieber, Esq.
David S. Ostern, Esq.
620 Eighth Avenue, 32nd Floor
New York, New York  10018
Telephone: (212) 218-5500
Email: cstieber@seyfarth.com
Email: dostern@seyfarth.com

18